Good morning, your honors. May it please the court, I'd like to reserve one minute for rebuttal. Yes, you may have it. And as a preliminary matter, I would like to address footnote number six in the appellee's brief, mea culpa. I changed my email address in January and failed to respond to a request requesting the appendix. The appellee's had access to the appendix at all points. They were forwarded a copy as well and were able to download it. Pardon me, just send us a letter afterwards if you want to make a change in your brief. Okay. We have essentially two issues at the bar here. A First Amendment claim in a title seven. I'll address the First Amendment first. It's our position, first of all, the reason that I included the judgment for the pleading standard as the first part of the brief is if we read docket 58, which is included in my appendix, the First Amendment claim appears to have been administered or judged under a judgment for the pleading standard. If that is the case. No. Let's get to the merits of it. Okay. The First Amendment claim is done by the district court on reasoning that it may be suspect. Okay. I'll give you that. But the First Amendment claim ultimately is that what, she was transferred? Is that what the claim is about? The First Amendment will eventually tie into the title seven. There are two issues. There were two complaints that were raised. I know that, but what is she complaining about? Is it the transfer? The downside, the result, the lateral move was the transfer, several transfers, which we outlined in our complaint. Which transfer are you talking about? The one to Humacao. Initially, it was the one outside of the elite squad. She was a decorated 20-year veteran. Okay. And then she goes back and she's put in a job other than the job she had before. And she has to work weekends. She was relegated to the property room. Well, Counsel, I wonder if you say relegated to the property division. I gather you're suggesting by that, that that transfer involved, because it did not involve, as I understand from this record, a loss in pay or a loss in status in any formal sense. So you seem to be suggesting that there was some diminution of responsibility that might rise to the level of an adverse employment action. Yet it seems to me the only thing that you attempt to establish on this record is that she had to work, you say generally weekends, which she did not have to do before. But frankly, it appears to me from this record, when you go through it with respect to that weekend issue, there may have been four weekends over a period of a couple of years where she actually had to work. And that may matter if it's working on weekends that you say makes this lateral transfer an adverse employment action. So am I misreading the record in terms of how much weekend work she actually had to do? No, that is only one component, actually. And as we quoted in the two cases in our reply from page five, it's not limited to the weekends. There is on the record evidence that she was put into a room by herself. She was treated harshly by her coworkers. She was ostracized. She was isolated. And retaliation claims do not require that you simply are fired. This lady was a 20-year veteran. And everything that she lived for was her job. She could no longer talk to her friends. Okay. So that's your argument that the transfer actually was an adverse job action for purposes of retaliation. Is there anything else you'd add to that? Of course, the hostile work environment, which we went over in this part of the record. Extremely hostile work environment where she practically had a nervous breakdown. Okay. Now, they say that the reason she was transferred was there was an independent investigation of the two complaints against her for making statements that suggested that an affair was going on between one officer in the strike force and another. And that that investigator found that she had been very disruptive. What is your evidence that that is a pretext for discrimination or retaliation? If you'll bear with me. First of all, the statement was this. X gave Y a toothbrush. That is it. Pardon me. That is not the point. The point is that the way it was received by her coworkers in the strike force proved to be disruptive. And as a result, they thought transferring her elsewhere was the best thing for the strike force. Okay. If I continue my thought process, there was a statement that was an interpretation by Acevedo that she had made some sort of insinuation regarding an affair that was never her statement, that was never intended as a statement. You have to realize that this is part of the matter. I'm asking you what the evidence is that the conclusion was a pretext for discrimination. The transfer occurred 11 days after this alleged incident, and the rationale was gun violence. There's a lot of gun violence that can happen in 11 days. Second, there's evidence that these statements were coerced, the witness statements that she pointed to. No, there's no evidence they were coerced. She's suggesting that we draw an inference that they were coerced. Well, look at the direct evidence of the two witness statements from the two police officers who conveniently provided identical statements that they interpreted the toothbrush incident as some sort of insinuation relating to sexual misconduct. That is their party evidence. We can look at the statements. You know, the problem seems to be that you seem to want to challenge the investigation itself, but we've got a line of cases that says that when an employer acts on the results of an investigation, that the issue isn't whether the investigation itself reached the right result. The employer is entitled to assume that it did. So the question is, what evidence is there that the employer's statement, I acted as a result of the investigation and to alleviate the situation that the investigator described in his report, was pretextual, and so far you haven't advanced the ball at all. Judge Lynch asked you essentially that question twice, and I haven't heard anything resembling an answer. Well, look at the temporal proximity. Temporal proximity to what? Temporal proximity to the EEOC complaint or the statements that she made to the day of the investigation. This court can look at two sides of the coin. Are you talking about her EEOC testimony? Her EEOC testimony that occurred on Aug. And the investigator said he had no idea she was doing this, and there's no evidence he did. There is a genuine factual dispute as to that area. What makes the dispute? The investigator said I had no knowledge of any EEOC proceedings. And which investigator? We were talking about Merced, correct? The one, well. Merced was a direct report to Centeno-Torres, who was the one who had first did the complaint regarding the illegal use of cars directed against him, and who was aware of the Figueroa complaint. Counselor, there was a long-standing complaint about sexual harassment, sexual discrimination that had been filed maybe a year and a half or two years ago, but then a subpoena was issued requiring her to testify. Is there evidence in the record that co-employees who were involved in filing complaints about the rumors that she was spreading or an employer who was a superior person, is there any evidence in the record that they were aware of the subpoena that she had received requiring her to testify in the EEOC proceedings? Yes, Your Honor. I will direct this court to state this. Tell you what, put that in your letter as well, please, the reference to the record. I believe it was in February of 2010. Five letters to her supervisor, and I think it was 2-23-10 or 2-23-12, I can't remember, specifically addressed the sexual harassment claim. Okay, thank you. You've reserved some time, I think. Okay, please don't bother defending the district court decision and get to the issues. Okay, I just want to point out the timeline he was referring to, because Merced's investigation was from March 2010, so that was prior Santos' complaint against her supervisor, Torres Centeno, which was on April. She was a witness. She was not a witness on April 23, 2010, as he said. She was summoned for an interview with the agent who was investigating the case that was filed two years ago. So she attended a few interviews regarding the case during that process, and defendants were not aware of that case. She was not. She started working at the strike force of Calwas in 2009, and this incident of the sexual harassment happened in 2008 in another division with other people. So they were not aware of it, and there is no evidence on the record that they were. Counsel, isn't there a close temporal relationship between the issuance of that subpoena to the longstanding investigation and the complaints to her superiors about the rumors that she was spreading? Isn't there a relationship that comes down to a matter of days between the issuance of the subpoena and the reports about the rumors that she was spreading? Doesn't the record indicate there is that temporal relationship? You're right, Your Honor. It's between weeks. But what happened first was a complaint between Acevedo and Figueroa about her comments of the affair. That was first. And then two weeks after that was a complaint, her complaint, against defendant Torres-Santeno because of the misuse of the vehicles. And after that was the interview that she had with Maria Arteza, which was the agent who was investigating the sexual harassment that was ongoing for two years or so. And she was transferred in on May. I'm sorry. I'm thoroughly confused. Are you saying, yes, it may have been in proximity, but the complaints against her were made before any subpoena was issued? That's right. It was made before, yes. Is there any evidence that the explanation for the transfer was a pretext for retaliation or discrimination? It is not, Your Honor. And we have to take this in consideration, the workplace they were working for, they were in the strike force. It's a division about trust. And when this incident happened, it was properly addressed by the supervisor, which was Torres-Santeno, to direct it to his supervisor, Merced, to investigate. And he interviewed, it's on the record that he interviewed agent Maribel Cartagena, which was Santos' supervisor at the moment. She had two supervisors, Torres-Santeno, which is a defendant, and Maribel Cartagena, which is not. And Luis Matos Merced. And Merced, during the investigation, and this is on the record in docket number 134, he asked about the conduct of the agents assigned to the strike force in light of these comments. And the conclusion was, it was not welcome. It caused a disruption, the environment was not healthy, and you know, Your Honor, when you have to go out on operation with the strike force, your life depends on your partner. And there is no trust. It was a reasonable and non-discriminatory action to transfer her back to where she was from. And it's interesting to note that she never challenged, she never asked to be transferred back to the strike force. Her claim then was that she wants to be assigned to the special arrest, which did not process. Because it is on the record, too, in docket number 134, page 30, that there was not space available for her at the special arrest division. There was a need in the property division due to the increase of property crimes in the area in Cahuas. Okay. Anything else? If you don't have any other questions, I will rely on the brief. Thank you. Thank you. Counsel. I'll be quite brief. Your Honor, discovery had been done. This case was close to trial. This would have been a four-hour trial. The pretextual investigation, not the results of the investigation, the investigation itself is highly suspect. To simply comment that I gave someone a toothbrush, this Court can review it for what it is. Thank you. Thank you very much. Thank you. Thank you.